UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

---

KEVIN OMAR HARPER,

                Plaintiff,

v.                                        Case No. 20-cv-493-pp

MICHAEL GIESE, ANGELA WALLENHAUPT,
JAMES MATTHEWS, BRENDA GREENWALD,
LEWANDOWSKI, KARLA GABOR, LT SHALLOW,
CO BOYLE, CO TINGLE, ASTI, WELLPATH, LLC,
KITCHEN SUPERVISOR PAUL, LT SONEBURG,
CO MUELLER, CO FISCAL, WAUKESHA COUNTY,
WAUKESHA COUNTY SHERIFF'S DEPARTMENT,
MENTAL HEALTHCARE WORKER LAURIE,
MENTAL HEALTHCARE WORKER KRISTINA,
JOHN DOE FOOD SERVICES PROVIDER,
JOHN DOE CO, JOHN DOE ADMINISTRATIVE ASSISTANT
and JOHN DOE PROPERTY OFFICER,

                Defendants.

---

**ORDER SCREENING PLAINTIFF'S SECOND AMENDED COMPLAINT
(DKT. NO. 14)**

---

Plaintiff Kevin Omar Harper, an inmate at Green Bay Correctional Institution who is representing himself, filed a complaint under 42 U.S.C. §1983 alleging that the defendants violated his constitutional rights while he was incarcerated at the Waukesha County Jail. Magistrate Judge William E. Duffin (to whom the case is assigned) screened the plaintiff's complaint on May 11, 2020, dkt. no. 11, and screened his amended complaint on June 9, 2020, dkt. no. 13. Judge Duffin gave the plaintiff the opportunity to file a second amended complaint, which the court received on July 9, 2020. Dkt. No. 14.

1

Although the plaintiff consented to Judge Duffin hearing and deciding the case, the defendants have not yet had the opportunity to decide whether to consent because, until now, the court has not ordered the plaintiff's complaint (or amended complaint) to be served on the defendants. Because both parties have not yet consented to the magistrate judge hearing the case, the clerk's office has referred the case to this district judge to screen the second amended complaint and decide whether it should be served on any of the defendants. The court will explain which claims the plaintiff has stated against which defendants, then will return the case to Judge Duffin for further proceedings.

**I.     Screening the Second Amended Complaint**

    A.     Federal Screening Standard

The plaintiff is familiar with the screening standard from Judge Duffin's prior screening orders. As Judge Duffin explained, to state a claim, a complaint must include "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed. R. Civ. P. 8(a)(2). To state a claim for relief under 42 U.S.C. §1983, a plaintiff must allege that someone deprived him of a right secured by the Constitution or the laws of the United States, and that whoever deprived him of this right was acting under the color of state law. D.S. v. E. Porter Cty. Sch. Corp., 799 F.3d 793, 798 (7th Cir. 2015) (citing Buchanan–Moore v. Cty. of Milwaukee, 570 F.3d 824, 827 (7th Cir. 2009)).

B. The Plaintiff's Allegations

The plaintiff alleges that while he was housed at the Waukesha County Jail on a probation hold, the defendants discriminated against him in various ways because of he is a follower of Islam. Dkt. No. 14.

He asserts that on November 13, 2017, he was taken to the Waukesha County Jail on a probation hold, and that during the booking process, he told defendant CO Boyle that he is Muslim and requires religious accommodations such as a prayer rug, Koran and a halal diet. Id. at ¶18. The plaintiff says that Boyle became belligerent and told him that the jail is a "Jesus Jail." Id. He says she made "racist, demographic-based and anti-Islamic remarks." Id. The plaintiff asserts that Boyle placed him "in an isolation cell and told [him he] would be dealt with." Id.

The plaintiff says that defendant Captain Greenwald eventually passed his cell. Id. The plaintiff alleges that he explained to her how Boyle had treated him. Id. Greenwald allegedly confirmed that the jail was a "Christian Jail" and asked him if he was willing to accept Jesus into his life. Id. The plaintiff says he told her no. Id. In response, Greenwald allegedly became enraged and told the plaintiff "his kind" was not welcome at the jail, that he was a devil and that his religious accommodations would not be honored at the jail. Id. The plaintiff states that she quoted Biblical scriptures while swearing revenge on him. Id.

The plaintiff says that a short while later, John Doe CO came to the plaintiff's cell and told him he would be receiving a "special" strip search reserved for Muslims. Id. at ¶19. The plaintiff asserts that the John Doe CO

searched him with his bare hands, allegedly probing and squeezing the plaintiff's genital and anal area to the point it caused pain and made the plaintiff bleed. Id. John Doe CO allegedly told the plaintiff that Boyle and Greenwald told him to conduct the search and warned the plaintiff that if the plaintiff told anyone, he'd be dead in a week. Id.

The plaintiff says that once he was escorted to his cell, he notified Boyle and Greenwald about the sexual assault; he says they both laughed and told him they had authorized the "strip search." Id. at ¶20. Greenwald allegedly told the plaintiff that after speaking to the classification committee, due to his Islamic beliefs he would be housed in the restricted housing unit. Id. The plaintiff states he was in the restricted housing unit the entire time he was at the jail, from November 13, 2017 until May 15, 2018, when he transferred to Dodge Correctional Institution. Id.

The plaintiff states that while he was at the jail, he sought to attend Jumah services, Toleem services and to speak with an Islamic cleric (imam). Id. at ¶21. (The plaintiff does not clarify if there were volunteers available to lead such services or if an imam was available to meet with inmates.) The plaintiff says that unit staff told him to ask the captains at the jail. Id. The plaintiff states that on several occasions he brought this issue to the attention of defendants Gabor, Greenwald and Lewandowski. Id. He says that all three of them "expressed negative and disrespectful statements about Islam and stated that although they had the authority to assist [him], they would not go out of their way to help a 'Muslim like [him]." Id. The plaintiff says that Gabor,

4

Greenwald and Lewandowski also told him that his only chance was to convert to Christianity for religious salvation. Id.

The plaintiff asserts that he was frustrated, so he contacted defendants Jail Administrator Giese and Deputy Jail Administrator Wallenhaupt several times, asking them to accommodate his requests to attend religions services and meet with an imam. Id. at ¶22. The plaintiff alleges that although they had the authority to grant his requests, Giese and Wallenhaupt denied them. Id.

The plaintiff states that while he was at the jail, he noticed that Christian inmates were allowed to attend religious services and regularly meet with a religious leader. Id. at ¶23. The plaintiff says he pointed out this discrepancy to Giese, Wallenhaupt, Gabor, Greenwald and Lewandowski, but that they either "turned a blind eye" or were "brazenly indifferent about the unequal treatment." Id. at ¶24. Greenwald, Gabor and Lewandowski allegedly said things such as, "It's what Jesus would want" or "[A]ll the reason why you should convert to Christian, you'll be treated better." Id.

The plaintiff also asserts that he repeatedly told Gabor, Greenwald and Lewandowski that he needed a prayer schedule and a prayer rug so he could perform his five times daily salat prayer on time. Id. at ¶¶25-26. The plaintiff explains this is a main tenet of Islam. Id. at ¶25. The plaintiff says that the defendants denied his requests. Id. at ¶26. Gabor allegedly said, "there [i]s no such thing as a prayer rug or prayer schedule" and that "Jesus wouldn't approve of such blasphemy." Id.

The plaintiff states that he then sent his request to Wallenhaupt, who after a long delay approved giving the plaintiff an extra towel to be used as a prayer rug. Id. at ¶27. The plaintiff asserts that she denied his request for a prayer "sheet"—the court assumes he means a prayer schedule. Id. The plaintiff explains that on the few occasions jail staff (he does not specify who) provided him with an extra towel, the towel was soiled, smelled of urine or feces or had bodily fluids on it. Id. The plaintiff asserts that he was outraged by this, and that he asked Greenwald, Gabor, Lewandowski, Giese and Wallenhaupt for a clean prayer towel and a prayer schedule, but they denied his requests. Id. at ¶28. The plaintiff asserts that Gabor, Greenwald and Lewandowski told him that if he were to convert to Christianity, he "wouldn't have to worry about praying on all fours like a dog." Id. at ¶29.

The plaintiff next asserts that on multiple occasions, he made the staff aware that he was a Sunni Muslim and that he needed a Quran. Id. at ¶31. He says that he made Lts. Soneburg and Asti aware of this, but that they both told the plaintiff that inmates in segregation were not allowed access to the Koran.[1] Id. The plaintiff asserts that they indicated they had the ability to provide him one, but that they were choosing not to. Id.

The plaintiff asserts that he directed his request for the Koran to Gabor, Greenwald and Lewandowski. Id. at ¶33. The plaintiff asserts that they told him they had the ability to provide him with the Koran, but because of their animus toward Islam, they refused to do so. Id. They allegedly emphasized that

---

[1] The plaintiff uses both spellings—"Quran" and "Koran."

6

Case 2:20-cv-00493-WED-PP   Filed 12/01/20   Page 6 of 20   Document 16

"in the Waukesha County Jail Rules, Rule #30 states that inmates in restricted housing are only allowed one Bible." Id. The plaintiff says that Greenwald tried to give him a Bible and an anti-Islamic book written by Sean Hannity. Id. The plaintiff says he then contacted Giese and Wallenhaupt, who also denied the plaintiff's request for the Koran. Id. at ¶34.

The plaintiff explains that he tried to have two different book vendors mail him a Koran. Id. at ¶35. The plaintiff asserts that John Doe property officer and John Doe administrative assistant refused to allow the Koran "access to" the institution. Id. The plaintiff states that he tried appealing that decision, but his appeal was denied (he does not clarify by whom), and the decision was upheld by Wallenhaupt and Giese. Id. at ¶¶35-36. According to the plaintiff, Gabor, Greenwald and Lewandowski also refused the plaintiff's request to allow the Korans he had ordered into the institution, telling him that "the Holy Koran is a security threat to the jail security and institution." Id. at ¶37. The plaintiff says none of the defendants notified the senders that the jail was rejecting the Korans. Id.

The plaintiff asserts that he also wrote to the Waukesha County Sheriff's Department to make them aware of the problem but they did not respond. Id. at ¶38. The plaintiff states that Wallenhaupt, Giese, Gabor, Greenwald, Lewandowski, John Doe administrative assistant and John Doe property officer allowed Christian and non-Muslim inmates to order Bibles from outside vendors and provided them with ready access to Bibles. Id. at ¶39. The plaintiff also asserts that, on the unit book cart, there were no Korans, but there were

7

dozens of Bibles. Id. Gabor allegedly told the plaintiff that this was to promote Christianity. Id. The plaintiff also states that, at the canteen, the Koran cost $45, which the plaintiff could not afford, but Bibles were free. Id. at ¶40. The plaintiff again asserts that Greenwald, Gabor and Lewandowski often told him that if he was having problems because he could not access a Koran, he could switch his religion to Christianity, and told him that he had no right to have Islamic texts or publications, only Christian-based publications. Id.

The plaintiff also asserts that he told Gabor, Greenwald and Lewandowski that he required a halal diet. Id. at ¶42. The plaintiff says they refused his requests, so he reached out to Wallenhaupt who approved a Kosher diet. Id. The plaintiff explains the Kosher diet was not in line with his "religious scruples, or Halal safe." Id. The plaintiff states he complained to Giese and Wallenhaupt, who gave him a variety of diets that they knew were not halal safe, such as the general population food tray, a vegetarian food tray, and the Kosher food tray. Id. at ¶43.

The plaintiff asserts that he told defendant health services administrator Matthews that the vegetarian tray made his stomach hurt. Id. at ¶44. He asked Matthews to tell the administration to provide him with a halal diet. Id. The plaintiff asserts that Matthews "retaliated against" him by giving him a diabetic food tray, which Matthews knew was not halal-safe. Id.

The plaintiff asserts that once he started complaining he wasn't getting the right food tray, he started receiving food that was rotten, contaminated with hair, undercooked, dirty or contained notes or pork products. Id. at ¶45. He

8

says the food was often inedible and was not nutritionally adequate. Id. at ¶47. The plaintiff also allegedly complained to defendant kitchen supervisor Paul and the food service provider, but that they did not help him. Id. at ¶46.

The plaintiff states that he lost more than thirty pounds, suffered hallucinations, attempted suicide, suffered psychosis and ate his own feces. Id. at ¶47. The plaintiff states that he told Matthews, Wellpath and mental health care workers Laurie and Kristina what was going on, but they refused to help him. Id. at ¶48.

The plaintiff asserts that he tried to resolve his issues through the grievance process, but that Giese, Wallenhaupt, Gabor, Greenwald and Lewandowski often thwarted his efforts by placing him on "grievance restriction," telling him the issues were not grievable or destroying, rerouting and ignoring his grievances. Id. at ¶49. The plaintiff also asserts that Giese, Wallenhaupt, Gabor, Greenwald and Lewandowski regularly falsified, failed to report, or altered records to make it look like they had tried to help the plaintiff. Id. at ¶50. He says that they regularly threatened him for reporting the conditions of confinement at the jail and that they or their subordinates wrote him false conduct reports. Id.

As relief, the plaintiff seeks a declaration that these actions violated his constitutional rights, and a "permanent injunction upholding the plaintiff's religious rights and a policy change." Id. at page 14. He also seeks $20,000 in compensatory damages and $15,000 in punitive damages against each defendant, as well as costs and fees. Id.

9

C. <u>Analysis</u>

The plaintiff alleges that the defendants infringed on his freedom to practice his religion and treated him differently than they treated other inmates because of his religious beliefs. "The government violates the free exercise clause where it takes action that burdens an individual's practice of his faith by pressuring him to either commit an act forbidden by the religion or by preventing him from engaging in conduct which his faith mandates." <u>McRoy v. Cook Cty. Dep't of Corr.</u>, 366 F. Supp. 2d 662, 673 (N.D. Ill. 2005) (citing <u>Hobbie v. Unemployment Appeals Comm'n of Fla.</u>, 480 U.S. 136, 140-41 (1987)). With respect to the plaintiff's allegations that the defendants discriminated against him because of his religious beliefs, the question under the establishment clause and the equal protection clause is whether the defendants "singl[ed] out particular religions for special treatment without a secular reason for doing so." <u>Goodvine v. Swiekatowski</u>, 594 F. Supp. 2d 1049, 1058-59 (W.D. Wis. 2009). The court will apply this general framework to each issue the plaintiff describes in his complaint.

1. *Intake and Housing Assignment*

The court will allow the plaintiff to proceed on claims under the establishment clause and the equal protection clause against Greenwald, Boyle, Lewandowski, Tingle, Shallow, Fiscal and Mueller based on his allegations that they treated him differently during intake and/or decided to

house him in the restricted housing unit because of his Islamic beliefs.[2] See Kaufman v. McCaughtry, 419 F.3d 678, 683 (7th Cir. 2005); West v. Kingsland, 679 F. App'x 482, 485 (7th Cir. 2017) (noting that, although claims of religious discrimination typically fit into the framework of the First Amendment, a plaintiff is not precluded from arguing that he was denied equal protection).

2. *Strip Search*

The plaintiff has stated a claim under the establishment clause and the equal protection clause based on his allegations that Greenwald and Boyle ordered John Doe officer to perform a "special" strip search on the plaintiff because he is Muslim. He also may proceed against John Doe officer for performing the "special" search. The plaintiff has stated a claim against these defendants based on his allegations about the way the "special" search was performed. The plaintiff equates the search to a sexual assault, which caused him pain and caused him to bleed.

According to the plaintiff, he was at the jail on a probation hold, so it is not clear if the plaintiff's rights regarding the manner of the search derive from the Fourth Amendment (which applies to pretrial detainees) or the Eighth Amendment (which applies to convicted prisoners). See King v. McCarty, 781 F.3d 889, 899-901 (7th Cir. 2015). For purposes of screening, it is not

---

[2] The plaintiff alleges that the classification committee decided to house him in the restricted housing unit because he practices Islam. He asserts that he has identified some of the members of this committee as Lewandowski, Tingle, Shallow, Fiscal and Mueller. If during discovery the plaintiff identifies additional committee members who were personally responsible for making this decision, he may ask the court to add those members as defendants.

11

necessary for the court to make that determination because the plaintiff has stated a claim under either amendment. See Taufner v. Doe, No. 19-cv-1288, 2020 WL 3415630, at *3 (E.D. Wis. June 22, 2020).

3. *Koran*

The court will allow the plaintiff to proceed on claims under the free exercise clause, the establishment clause and the equal protection clause against Soneburg, Asti, Gabor, Greenwald, Lewandowski, Giese, Wallenhaupt, John Doe property officer and John Doe administrative assistant based on his allegations that they refused to let him have a Koran because he was in the restricted housing unit even though Christians were allowed to have Bibles, that they refused to accept Korans from outside vendors even though they accepted Bibles from outside vendors and that they offered free Bibles to inmates but charged $45 for the Koran. See Goodvine, 594 F. Supp. 2d at 1058-59.

4. *Religious Services and Imam Visits*

The court will allow the plaintiff to proceed under the free exercise clause, the establishment clause and the equal protection clause against Greenwald, Gabor, Lewandowski, Giese and Wallenhaupt based on his allegations that they facilitated religious services and visits from religious leaders for Christian inmates but refused to do so for him because he was Muslim. The court acknowledges that prison officials need not offer services and visits when there are no volunteers to lead services or visit with inmates. See McRoy, 366 F.Supp.2d at 674-80. Further development of the record is

12

necessary to determine why the defendants refused to facilitate services and visits for the plaintiff; at the pleading stage, the court will allow the plaintiff to proceed on this claim.

        5.      *Prayer Rug and Schedule*

The plaintiff may proceed under the free exercise clause against Greenwald, Gabor, Lewandowski, Giese and Wallenhaupt based on his allegations that they refused to provide him with a clean prayer rug/towel and a prayer schedule. Although prison officials are not required to do a prisoner's research for him, affirmative obligations may be appropriate "[w]hen a prisoner has no way to practice his religion without assistance from the prison." Goodvine, 594 F. Supp. 2d at 1060. The plaintiff suggests that prison officials would not allow him to meet with an imam, which the court construes broadly to mean he had no ability to research a prayer schedule on his own. Further, because it is unclear from the plaintiff's allegations whether he was able to order his own prayer mat/towel, the court will assume that he was not and that he was reliant on prison officials to assist him in practicing this element of his religion.

The court will not allow the plaintiff to proceed under the establishment clause or equal protection clause based on these allegations. The plaintiff's allegations do not give rise to a reasonable inference that these defendants provided practitioners of other religions with items or objects to assist them in practicing their religion or that they did research for practitioners of other religions to assist them in practicing their religion.

13

### 6. *Halal Diet*

The plaintiff also may proceed under the free exercise clause, the establishment clause and the equal protection clause based on his allegations that Gabor, Greenwald, Lewandowski, Wallenhaupt, Giese and kitchen supervisor Paul refused to provide him with a halal-safe diet. The plaintiff does not expressly allege that prisoners of other faiths were given greater accommodation in receiving their special diets, see Goodvine, 594 F. Supp. 2d at 1059, but he asserts that in response to his requests for a halal diet, he received a Kosher diet, suggesting that, at a minimum, Jewish inmates were provided a special diet as an accommodation. Given the court's obligation to construe a *pro se* plaintiff's allegations broadly, the court finds the plaintiff states a claim.

The court also will allow the plaintiff to proceed on a claim against these defendants based on his allegations that the various food trays they provided to him were nutritionally inadequate and often inedible. The plaintiff alleges that he told the defendants he could not eat much of the food on the food trays, yet they failed to provide him with additional or substitute foods to make sure he received adequate nutrition. Further development of the record is necessary before the court can determine whether the plaintiff's right to humane conditions of confinement arise under the Eighth Amendment or Fourteenth Amendment.

The court will not allow the plaintiff to proceed against the Doe food service provider based on his allegations that it ignored his letter about

receiving food that was not halal-safe. The plaintiff does not allege that the food service provider had authority or personal responsibility for determining what food was delivered to particular inmates, nor do the plaintiff's allegations suggest the existence of a policy or practice of denying Muslim inmates halal-safe food when jail officials order such food. See Shields v. Ill. Dept. of Corr., 746 F.3d 782, 795-96 (7th Cir. 2014) (explaining that *respondeat superior* liability to does not apply to corporations under §1983, so to state a claim a plaintiff must alleged that his injury was caused by a policy, custom or practice).

The plaintiff has not stated retaliation claims in connection with his requests for a halal-safe diet. "A complaint states a claim for retaliation when it sets forth a chronology of events from which retaliation may plausibly be inferred." Zimmerman v. Tribble, 226 F.3d 568, 573 (7th Cir. 2000). The plaintiff asserts that, after he notified Matthews that the vegetarian tray upset his stomach, Matthews "retaliated" by switching his food tray to a diabetic food tray. The fact that Matthews's attempt to address the plaintiff's complaints of stomach pain did not give the plaintiff what he wanted with regard to his religious diet does not plausibly suggest that Matthews was retaliating against the plaintiff; it suggests that Matthews either had limited and insufficient food tray options to respond to the plaintiff's complaints or that he was unaware of what constituted a halal diet.

The plaintiff alleges that shortly after he started complaining about his food trays, his food became largely inedible. While this chronology may suggest

15

retaliation, it is unclear from the plaintiff's complaint *who* was responsible for providing him with bad or inedible. Was it the kitchen staff? Correctional officers? The court does not know because the plaintiff does not say. The plaintiff's bare allegations of retaliation are not sufficient to state a claim against unidentified defendants.

       7.    *Monell Claim*

Under Monell v. New York City Dep't of Soc. Servs., 436 U.S. 658 (1978), a plaintiff may state a claim against a municipality based on allegations that a municipal policy or custom, as opposed to the acts of the municipality's agents, violated his constitutional rights. Glisson v. Ind. Dep't of Corr., 849 F.3d 372, 378-79 (7th Cir. 2017). The court will allow the plaintiff to proceed against Waukesha County based on his allegations that the jail had a policy or custom of treating Muslim inmates differently than it treated inmates of other religions (particularly Christianity).

The plaintiff has not, however, stated a claim against the Waukesha County Sheriff's Department. Section 1983 allows a plaintiff to sue a "person" who violates his constitutional rights under color of state law. A sheriff's department is not a "person." While the Supreme Court has held that there are some circumstances in which municipalities or local government units can be considered "persons" and sued under §1983, Monell, 436 U.S. at 658, a sheriff's department is not a municipality or a local government unit. Fed. R. Civ. P. 17(b) states that defendants in a federal lawsuit must have the capacity to be sued. State law determines an entity's capacity to be sued. Webb v.

16

Case 2:20-cv-00493-WED-PP   Filed 12/01/20   Page 16 of 20   Document 16

Franklin Cty. Jail, No. 16-cv-1284-NJR, 2017 WL 914736, at *2 (S.D. Ill. Mar. 8, 2017). Under Wisconsin law, a county sheriff's department "is not a legal entity separable from the county government which it serves," and is therefore not subject to suit under §1983. Whiting v. Marathon Cty. Sheriff's Dept., 382 F.3d 700, 704 (7th Cir. 2004). The court will dismiss the Waukesha County Sheriff's Department as a defendant.

### 8. *Mental Health Treatment*

The court will not allow the plaintiff to proceed on claims against Wellpath, mental health care workers Laurie and Kristina or Health Service Administrator Matthews based on his allegations that these defendants provided him inadequate treatment after his mental health began to deteriorate as a result of inadequate nutrition. Under Fed. R. Civ. P. 20, a plaintiff may not assert unrelated claims against different defendants or sets of defendants in the same lawsuit. A plaintiff may not join multiple defendants into a single case unless the plaintiff asserts at least one claim to relief against all the defendants that arises out of the same incident or event or series of incidents and events. Balli v. Wis. Dep't of Corr., No. 10-CV-67-BBC, 2010 WL 924886, at *1 (W.D. Wis. Mar. 9, 2010). Although under Rule 18 a plaintiff may join unrelated claims against different defendants, he may do so "only after the requirements for joinder of parties have been satisfied under Rule 20 . . . ." Id.

The facts and law giving rise to the plaintiff's claim that he was not provided adequate mental health care do not overlap with the facts and law giving rise to his claims that he was discriminated against because of his

17

religious beliefs. Because these claims involve different sets of defendants and do not have questions of law and fact in common with the plaintiff's other claims, the plaintiff cannot pursue all these claims in the same case. In these circumstances, the Seventh Circuit has instructed courts to reject a complaint "either by severing the action into separate lawsuits or by dismissing the improperly joined defendants." Owens v. Hinsley, 635 F.3d 950, 952 (7th Cir. 2011) (citing Fed. R. Civ. P. 21). The court will dismiss Wellpath, Kristina, Laurie and Matthews because they are improperly joined in this case.

9. *Wisconsin Constitution and RLUIPA*

The plaintiff seeks to state claims under various sections of the Wisconsin Constitution. Dkt. No. 14 at 12-13. The state constitution does not authorize suits for money damages except in a limited exception that does apply in this case. Goodvine, 594 F. Supp. 2d at 1054 (citing W.H. Pugh Coal Co. v. State, 157 Wis.2d 620, 634-35 (1990)).

The plaintiff also cannot proceed under the Religious Land Use and Institutionalized Persons Act (RLUIPA). Under RLUIPA, the remedy available to a plaintiff is limited to declaratory or injunctive relief. West v. Grams, 607 F. App'x 561, 566 (7th Cir. 2015). Because the plaintiff has been transferred from the Waukesha County Jail where these violations allegedly occurred to another institution, his claims for declaratory and injunctive relief are moot because he is "no longer laboring under the allegedly unconstitutional policy or practice." Id. (citations omitted).

18

Case 2:20-cv-00493-WED-PP   Filed 12/01/20   Page 18 of 20   Document 16

10. *John Doe Defendants*

Because the plaintiff is suing John Doe defendants, he will need to use discovery to learn their names. When the time comes (after the named defendants have answered and the court issues a scheduling order in the case), he will be able to serve discovery requests on the named defendants (by mailing them to defense counsel). Generally, when a plaintiff identifies a Doe defendant, the court requires the plaintiff to comply with Civil Local Rule 15 (E.D. Wis.) and ask for leave to amend the complaint. Because the plaintiff is not represented by a lawyer and because the second amended complaint gives the Doe defendants notice of what the plaintiff believes they did to violate his constitution rights, the court will allow the plaintiff to file a motion to substitute the defendants' names for the Doe placeholders. Once the plaintiff identifies the Doe defendants, the court will replace the Doe placeholders with their names and will order the Marshals Service to serve them with the plaintiff's second amended complaint.

## III. Conclusion

The court **DISMISSES** James Matthews, Wellpath LLC, Waukesha County Sheriff's Department, Laurie, Kristina and John Doe Food Service Provider as defendants.

The court **ORDERS** the U.S. Marshals Service to serve a copy of the second amended complaint (Dkt. No. 14) and this order on defendants Michael Giese, Angela Wallenhaupt, Brenda Greenwald, Lewandowski, Karla Gabor, Lt. Shallow, CO Boyle, CO Tingle, Asti, kitchen supervisor Paul, Lt. Soneburg, CO

19

Mueller, CO Fiscal and Waukesha County under Federal Rule of Civil Procedure 4. Congress requires the U.S. Marshals Service to charge for making or attempting such service. 28 U.S.C. §1921(a). Although Congress requires the court to order service by the U.S. Marshals Service, it has not made any provision for either the court or the U.S. Marshals Service to waive these fees. The current fee for waiver-of-service packages is $8.00 per item mailed. The full fee schedule is provided at 28 C.F.R. §§0.114(a)(2), (a)(3). The U.S. Marshals Service will give the plaintiff information on how to remit payment. The court is not involved in collection of the fee.

The court **ORDERS** defendants Giese, Wallenhaupt, Greenwald, Lewandowski, Gabor, Shallow, Boyle, Tingle, Asti, kitchen supervisor Paul, Soneburg, Mueller, Fiscal and Waukesha County to file a responsive pleading to the second amended complaint.

The court **ORDERS** that the parties may not begin discovery until after the court enters a scheduling order setting deadlines for completing discovery and for filing dispositive motions.

The case is no longer referred to Judge Pepper. The court **RETURNS** this case to Judge William Duffin for further proceedings.

Dated in Milwaukee, Wisconsin, this 1st day of December, 2020.

BY THE COURT:

_____
**HON. PAMELA PEPPER**
**Chief United States District Judge**