KEVIN OMAR HARPER,

                Plaintiff,

v.                                             Case No. 20-cv-493-pp

PAUL HARDING,

                Defendant.

**ORDER GRANTING DEFENDANT'S AMENDED MOTION FOR SUMMARY JUDGMENT (DKT. NO. 95) AND DISMISSING CASE**

Plaintiff Kevin Omar Harper, who is confined at the Green Bay Correctional Institution and who is representing himself, filed this case alleging that former defendants Waukesha County Jail officials and defendant Paul Harding, who worked as a food supervisor at the jail, violated his rights when he was confined at the jail. The court screened the second amended complaint (dkt. no. 14) and allowed the plaintiff to proceed on constitutional claims against the former jail official defendants and defendant Harding based on allegations that they discriminated against him in various ways because of his Islamic beliefs.[1] Dkt. No. 16 at 10-16. The former jail official defendants

---

[1] Specifically, the court allowed the plaintiff to proceed on the following claims: (1) establishment clause and equal protection clause against former defendants Greenwald, Boyle, Lewandowski, Tingle, Shallow, Fiscal and Mueller based on allegations that they treated him differently during intake and/or decided to house him in the restricted housing unit because of his Islamic beliefs; (2) establishment clause and equal protection clause based on allegations that former defendants Greenwald and Boyle ordered John Doe officer to perform a "special" strip search on the plaintiff because he is Muslim, against John Doe officer for performing the "special" search and a claim under the Fourth or Eighth Amendment against these defendants for the manner in which they conducted the search; (3) free exercise clause, establishment clause and equal protection clause against former defendants Soneburg, Asti, Gabor, Greenwald,

1

stipulated to dismissal of the plaintiff's claims against them. Dkt. Nos. 74, 77. Defendant Harding, who is the sole remaining defendant, has filed an amended motion for summary judgment[2] on the plaintiff's claims that he refused to provide the plaintiff with a Halal-safe diet and that he provided the plaintiff with food trays that were nutritionally inadequate and often inedible. Dkt. No. 95. The court will grant the defendant's motion and dismiss the case.

---

Lewandowski, Giese, Wallenhaupt, John Doe property officer and John Doe administrative assistant based on allegations that they refused to let him have a Koran because he was in the restricted housing unit even though Christians were allowed to have Bibles, that they refused to accept Korans from outside vendors even though they accepted Bibles from outside vendors and that they offered free Bibles to inmates but charged $45 for the Koran; (4) free exercise clause, establishment clause and equal protection clause against former defendants Greenwald, Gabor, Lewandowski, Giese and Wallenhaupt based on allegations that they facilitated religious services and visits from religious leaders for Christian inmates but refused to do so for him because he was Muslim; (5) free exercise clause against former defendants Greenwald, Gabor, Lewandowski, Giese and Wallenhaupt based on allegations that they refused to provide him with a clean prayer rug/towel and a prayer schedule; and (6) free exercise clause, establishment clause and equal protection clause based on allegations that former defendants Gabor, Greenwald, Lewandowski, Wallenhaupt, Giese and current defendant Paul Harding (then identified as kitchen supervisor Paul) refused to provide him with a halal-safe diet, and a claim against these defendants based on his allegations that the various food trays they provided to him were nutritionally inadequate and often inedible under the Eighth or Fourteenth Amendment. Dkt. No. 16 at 10-16.

[2] On February 8, 2022, the court denied without prejudice defendant Harding's original motion for summary judgment because it did not include the "short and plain statement" required by Civil Local Rule 56(a)(1)(A) (E.D. Wis.) nor did it include the text of Federal Rules of Civil Procedure 56(c), (d), (e), Civil L.R. 56(a) and (b) and Civil L.R. 7, as required by Civil L.R. 56(a)(1)(B). Dkt. No. 92. The court granted the defendant leave to file an amended motion for summary judgment, which he did. Dkt. Nos. 92, 95.

2

## I. Facts

### A. Second Amended Complaint's Allegations Regarding Plaintiff's Claims Against Defendant Harding

In his second amended complaint, the plaintiff alleges that he told former defendants Captain Karla Gabor, Captain Brenda Greenwald and Captain Lewandowski that he required a Halal diet. Dkt. No. 14 at ¶42. The plaintiff says they refused his requests, so he reached out to former defendant Deputy Jail Administrator Angela Wallenhaupt, who approved a Kosher diet. Id. The plaintiff explains that the Kosher diet was not in line with his "religious scruples, or Halal safe." Id. The plaintiff states that he complained to former defendants Jail Administrator Giese and Wallenhaupt, who gave him a variety of diets that they knew were not Halal-safe, such as the general population food tray, a vegetarian food tray and the Kosher food tray. Id. at ¶43.

The plaintiff asserts that he told former defendant health services administrator Matthews that the vegetarian tray made his stomach hurt. Id. at ¶44. He asked Matthews to tell the administration to provide him with a Halal diet. Id. The plaintiff asserts that Matthews "retaliated against" him by giving him a diabetic food tray, which Matthews knew was not halal-safe. Id.

The plaintiff asserts that once he started complaining he wasn't getting the right food tray, he started receiving food that was rotten, contaminated with hair, undercooked, dirty, contained notes or pork products, and was often inedible. Id. at ¶45.

The plaintiff alleges that he complained to current defendant kitchen supervisor Paul Harding and the food service provider, but that they did not help him. Id. at ¶46. He states that the food he was given was not nutritionally adequate and that he lost more than thirty pounds, suffered hallucinations, attempted suicide, suffered psychosis and ate his own feces. Id. at ¶47.

3

B.  Defendant's Proposed Findings of Fact[3]

The plaintiff was a detainee at the jail between November 13, 2017 and May 15, 2018. Dkt. No. 97 at ¶1. The plaintiff was housed in the jail's segregation unit for the entirety of his stay, where he spent twenty-three to twenty-four hours a day in his cell. Dkt. No. 105 at ¶3. The plaintiff identifies as a member of the Islamic faith, and he requested a Halal diet when he arrived at the jail. Dkt. No. 97 at ¶¶4, 6.

The defendant was employed by Summit Food Services as a food or kitchen supervisor in the jail's kitchen between January 1, 2018 and September 26, 2018. Dkt. No. 97 at ¶2. Summit Food Services, the entity that prepared and served food to detainees at the jail, offered a variety of menu diet options, including: (1) Kosher; (2) vegetarian; (3) diabetic; (4) general; and (5) Halal. Dkt. No. 97 at ¶5. As kitchen supervisor, the defendant supervised and oversaw incarcerated persons who prepared the meals in the kitchen. Dkt. No. 97-2 at ¶3.

According to the defendant, throughout the plaintiff's confinement at the jail, the plaintiff made several dietary requests, which resulted in his placement on the following diets: (1) Kosher; (2) diabetic; (3) regular diet; and (4) Halal. Dkt. No. 97 at ¶7. According to the plaintiff, he requested only the Halal diet, but jail staff and the defendant disregarded his request and placed him on other diets against his will. Dkt. No. 102 at ¶7.

Former Administrator Wallenhaupt approved and/or denied dietary requests from incarcerated persons and submitted the requests to the kitchen for compliance. Dkt. No. 97 at ¶9. The plaintiff knew that Wallenhaupt

---

[3] The court includes only material, properly supported facts in this section. See Fed. R. Civ. P. 56(c).

reviewed and approved his dietary requests and religious accommodations. Id. at ¶10. The defendant did not have the authority to approve or deny dietary requests, and instead was required to follow Wallenhaupt's decisions. Id. at ¶11.

The jail's kitchen served about two hundred incarcerated persons for every meal. Dkt. No. 97 at ¶12. While he was at the jail, the plaintiff received food daily during the scheduled times. Id. at ¶13. According to the plaintiff, although he was offered food almost every day, the amount of food was insufficient for an adult man, which caused him to seek medical assistance. Dkt. No. 102 at ¶13. The plaintiff also states that the food was not "nutritionally sound," and that it was dirty, undercooked, contaminated or non-halal. Id.

When detainees had complaints or issues regarding their meals, they were required to complete a Waukesha County Jail Inmate Communication Form and the appropriate jail official would respond in writing to the grievance. Dkt. No. 97 at ¶44. The plaintiff submitted several inmate communication forms regarding his dissatisfaction with his diet, stating that he did not believe his meals complied with a Halal diet. Id. at ¶45. When detainees had immediate issues with a meal, such as the food being rotten, undercooked, containing pork products or containing a hair, they were to immediately notify the correctional officer in their unit. Id. at ¶47. If the correctional officer had a question about a food complaint from a detainee, or if the correctional officer deemed the food item or meal needed to be replaced, the officer was to communicate the issue to the kitchen. Id. at ¶48.

On December 23, 2017 (before the defendant had started working as the kitchen supervisor), the plaintiff submitted an inmate communication form to

5

"Kitchen" requesting to be removed from the "diabetic lunch." Dkt. No. 97 at ¶16. The form states that the plaintiff accepted the lunch only because he thought he would be getting a diabetic snack in addition to his Halal tray. Dkt. No. 97-1 at 26. The plaintiff stated on the form that he was starting to lose weight because he didn't eat the "filth" he was being provided. Id. On December 26, 2017, the plaintiff was advised in writing that he had been removed from the Halal diet. Dkt. No. 97 at ¶18.

On January 1, 2018, the defendant started as the food supervisor in the kitchen at the jail. Id. at ¶19. The next day, the plaintiff submitted an inmate communication form to "L.T. or Captain," stating that he had received non-Halal foods for three days in a row, that he had received a rotten apple and that the corn taco shells he was served were not Hhalal and they made his stomach hurt. Id. at ¶20. The defendant responded to the plaintiff's inmate communication form in writing: "You were listed as Kosher diet. You are now labeled as a Halal diet." Id. at ¶21.

On January 4, 2018, the plaintiff submitted an inmate communication form to "CBM Kitchen," advising:

> I currently receive Halaal. However your Department keeps getting it wrong. Please include cake or cookies as the dessert on my Food Tray. Also, Haalal is supposed to be rich in ~~food~~ meat items. So if possible please include the microwaveable soup w/ my food Tray. Thank you.

Dkt. No. 97 at ¶23. The defendant wrote on the form that meat and gravy could contain a pork seasoning or byproduct. Id. at ¶24. Captain Lewandowski responded on the form that there was no pork served at the jail. Id. The plaintiff believed that jail served pork based on information he received from non-kitchen jail staff as well as some packaging labels he read. Id. at ¶25.

6

On January 5, 2018, the plaintiff submitted another inmate communication form to "Kitchen" requesting that it "stop including applesauce in my [H]alaal food trays this is not an approved Halaal food item." Id. at ¶27; Dkt. No. 97-1 at 29. The plaintiff stated that the applesauce could be replaced with Halal-approved cake or cookies. Id. The defendant wrote on the form that unsweetened applesauce was an approved Halal item. Dkt. No. 97 at ¶28.

On January 12, 2018, the plaintiff submitted an inmate communication form to "Kitchen," stating:

> I get Halaal meals. Please stop serving potatoes and Beans Every Day, with every meal. Halaal meals should be more diverse and include 2 peanut butter and jelly sandwiches with each meal as well. Thank you, PS- you can serve me Turkey.

Id. ¶30. The defendant wrote on the inmate communication form that the Halal meals were on a rotating menu cycle. Id. at ¶31.

The plaintiff submitted one inmate communication form to the defendant complaining of hair in his meal. Dkt. No. 97 at ¶50; Dkt. No. 97-1 at 31. On January 26, 2018, he submitted a form stating: "Today once again there was hair in my food. I told Officer Kelly and he took care of the issue. However this keeps occurring. Not only am I constantly getting hair in my food but also the food items the kitchen gives me are not Halaal." Dkt. No. 97-1 at 31.[4] The defendant wrote on the inmate communication form that staff followed sanitation procedures while in the kitchen and that the plaintiff received the proper Halal diet. Dkt. No. 97 at ¶51.

---

[4] The plaintiff disputes that he submitted only one inmate communication form to the defendant complaining of hair in his meal; he states that, during his confinement at the jail, he submitted "dozens of ICFs to Mr. Harding regarding the Food complaints." Dkt. No. 102 at ¶50. The inmate communication forms the plaintiff references are not addressed to the defendant; they are addressed to and answered by jail officials, and some of these predate the defendant's tenure as food supervisor at the jail. See Dkt. No. 103-1 at 15-20, 22-74.

7

The plaintiff submitted an inmate communication form to the "Kitchen" dated January 31, 2018, in which he stated:

> Today for lunch time and dinner time I received non-Halaal items once again. Also I received a rotten apple. I notified C.O. Maltby and C.O. Czeck about this and even showed C.O. Czeck, well Maltby on the food items there was a "K" for Kosher when there was suppose[d] to be an "H" for Halaal. Once again I was ignored and I went hungry.

Dkt. No. 103-1 at 1. The defendant wrote on the form, "Kosher and Halal both meet religious beliefs of each." Id.

On February 20, 2018, the plaintiff submitted another inmate communication form in which he stated that he "did not get my jelly that was suppose[d] to be in my Bag. I told C.O. Connen however he did not attempt to do the morally right thing and go to the kitchen for my jelly." Dkt. No. 97 at ¶34; Dkt. No. 97-1 at 32. Eight days later, the defendant wrote on the form, "A request was honored for a peanut butter sandwich. We honored this request. With proper notification, the kitchen will do its best to honor any request." Dkt. No. 97 at ¶35; Dkt. No. 97-1 at 32.

On April 6, 2018, the plaintiff submitted an inmate communication form to "Captain," which was crossed out; the words "Kitchen Supervisor" appear on the form. Dkt. No. 103-1 at 21. In this form, the plaintiff asks "what exactly qualifies the food items that the kitchen gives Muslim inmates as halaal? Please tell me what does the nutritionist here at WCJ considers Halaal food items. I need to know and why won't you place me on Halaal Food Trays. I need to know this as well." Id. (emphasis in original). The defendant wrote on the request form, "I have a halal menu accompany this for your review." Id.

According to the defendant, he was not involved in the selection of what constituted a "halal-safe" meal; the jail's dietician determined which meals complied with the Halal diet. Dkt. No. 97 at ¶¶36-37. The plaintiff disputes this

8

and states that the defendant told him that he "himself and not anyone else is responsible for determining what is Halal and as far as he is concerned 'dirty, undercooked, food w/ hair and "swine"' is considered Halal food in his book."[5] Dkt. No. 102 at ¶36; Dkt. No. 103 at ¶21.

The defendant did not have the authority to override and/or refuse to comply with any decision made by jail administration, including the dietician, in connection with detainees' dietary requests.[6] Id. at ¶39. As a detainee in the segregation unit, the plaintiff was not permitted to visit the kitchen and his meals were delivered to his jail cell. Id. at ¶40. Detainees who worked in the kitchens prepared the food, placed the food on trays and delivered meals to other incarcerated persons in their respective jail cells. Id. at ¶41. The plaintiff states that kitchen staff and correctional officers also delivered the food trays. Dkt. No. 102 at ¶41.

According to the defendant, he spent his entire workday in the kitchen, unless he was assisting with the delivery of food to a different facility or taking food to the garbage, at which time he did not interact with detainees. Dkt. No. 97 at ¶53. The plaintiff disputes this and states that on several occasions he

---

[5] The defendant objects to the plaintiff's response and contends that it relies on inadmissible hearsay. Dkt. No. 105 at ¶36. An opposing party's statement offered against the party and made by the party in an individual capacity is not hearsay. Fed. R. Evid. 801(d)(2)(A). The defendant does not explain why he thinks the statement is hearsay.

[6] The plaintiff states that he disputes this fact, but his citation does not dispute the fact. The plaintiff cites to a February 4, 2018 inmate communication form in which he stated that he notified C.O. Wandago that his dinner bag contained salami/baloney sandwiches and that Wandago replied, "That's what the kitchen sends up[,] you might as well eat it." Dkt. No. 102 at ¶39; Dkt. No. 103-1 at 1. The defendant provided a written response to the plaintiff's Communication Form, stating "Unless Halal bag is requested by officer on duty, a standard bag is sent." Dkt. No. 103-1 at 1.

9

interacted with the defendant on the unit and in the hallway while the plaintiff was being escorted.[7] Dkt. No. 102 at ¶53. According to the defendant, he was never informed of or made aware of the plaintiff's alleged medical and mental health struggles that were allegedly linked to his diet at the jail. Dkt. No. 97 at ¶55. The plaintiff disputes this and states that the defendant observed his "emaciated state." Dkt. No. 102 at ¶55.

According to the defendant, the plaintiff was never told that his alleged health issues were related to the food at the jail. Dkt. No. 97 at ¶56. The plaintiff states that he weighed 210 pounds when he entered the jail on November 13, 2017, and that he weighed 169 pounds when he transferred to Dodge Correctional Institution on May 15, 2018. Dkt. No. 102 at ¶56. He states that he was underweight and undernourished when he left the jail and that he suffered from vitamin deficiency, digestive inflammation and bloody stools while at the jail. Id.

---

[7] In his declaration, the plaintiff describes these interactions as follows. First, he states that on February 21, 2018, the defendant expressed to the plaintiff that he hated the plaintiff's "Islamic ass" and that he believed Islamic inmates should not be fed properly "on American soil." Dkt. No. 103 at ¶13. The plaintiff states that after the defendant made these statements, the plaintiff routinely received food shortages. Id. In addition, the plaintiff states that between March and May 2018, the defendant told him he was intentionally placing pork products, dirty and inedible food items on the plaintiff's and other Muslim detainees' food trays because he believed they were personally responsible for the "tragic 9/11 terrorist attack." Id. at ¶16. The plaintiff states that between March and May of 2018, the defendant made comments relating to the plaintiff's weight loss and his emaciated state. Id. at ¶15. The plaintiff states that on several occasions, the defendant "cracked jokes about medical and mental health issues caused by the food shortages that he caused and joked about the plaintiff's Islamic affiliation, specifically telling him that for a 'Black Muslim' he looked like an 'starving white Jew in a holocaust camp.'" Id.

## II. Analysis

### A. Summary Judgment Standard

"The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Federal Rule of Civil Procedure 56(a); see also Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986); Celotex Corp. v. Catrett, 477 U.S. 317, 324 (1986); Ames v. Home Depot U.S.A., Inc., 629 F.3d 665, 668 (7th Cir. 2011). "Material facts" are those under the applicable substantive law that "might affect the outcome of the suit." See Anderson, 477 U.S. at 248. A dispute over "material fact" is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id.

A party asserting that a fact cannot be, or is, genuinely disputed must support the assertion by:

> (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or
>
> (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact.

Fed. R. Civ. P. 56(c)(1). "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated." Fed. R. Civ. P. 56(c)(4).

### B. Discussion

#### 1. *Religion-Based Claims*

"Prisoners retain the right to exercise their religious beliefs, although that right is not unfettered." Ortiz v. Downey, 561 F.3d 664, 669 (7th Cir.

2009). Where prison officials "personally and unjustifiably place[ ] a substantial burden on [an inmate's] religious practices," they may violate the incarcerated person's constitutional rights. Thompson v. Holm, 809 F.3d 376, 379-80 (7th Cir. 2016) ("We have repeatedly held that forcing an inmate to choose between daily nutrition and religious practice is a substantial burden."). "A substantial burden '[p]uts substantial pressure on an adherent to modify his behavior and to violate his beliefs.'" Id. (quoting Thomas v. Review Bd., 450 U.S. 707, 717-18 (1981)). "A burden is unjustified if it is not reasonably related to a legitimate penological interest." Id. To determine whether the burden is justified, a court must consider "(1) whether the restriction 'is rationally related to a legitimate and neutral governmental objective'; (2) 'whether there are alternative means of exercising the right that remain open to the inmate'; (3) 'what impact an accommodation of the asserted right will have on guards and other inmates;' and (4) 'whether there are obvious alternatives to the [restriction] that show that it is an exaggerated response to [penological] concerns.'" Id. (quoting Lindell v. Frank, 377 F.3d 655, 657 (7th Cir. 2004)).

The plaintiff has not shown that the defendant personally placed a substantial burden on the plaintiff's religious practice. For starters, it is undisputed that former defendant Administrator Wallenhaupt approved and/or denied dietary requests and submitted the requests to the kitchen for compliance. The defendant did not have the authority to approve or deny dietary requests and was required to follow Wallenhaupt's decisions. To the extent that the plaintiff claims that the defendant violated his rights by not placing him on a Halal diet, that claim must fail because he alleges it against someone who was not personally responsible for approving dietary requests. See Williams v. Shah, 927 F.3d 476, 482 (7th Cir. 2019); see also Burks v.

12

Raemisch, 555 F.3d 592, 595-96 (7th Cir. 2009) (Section 1983 limits liability to public employees "for their own misdeeds, and not for anyone else's.").

The plaintiff also claims that when he was, or should have been, on a Halal diet, he was served meals that contained non-Halal food. It is undisputed that the jail offers several dietary options, including Kosher, vegetarian, diabetic, general andHhalal. The jail's dietician, however, determined which meals and meal items were Hhalal. The defendant was not involved in the determination of what constituted a Halal-safe meal. The plaintiff's April 6, 2018 inmate communication form indicates that the plaintiff knew this because he asked, "Please tell what does the nutritionist here at WCJ considers Halaal food items [sic]." Dkt. No. 103-1 at 21. In response, the defendant sent him a Halal menu for review. Id.

The plaintiff insists that the defendant determined what meals complied with the Halal diet because during one conversation he had with the defendant between February and May of 2018, the defendant allegedly told the plaintiff that he "himself and not anyone else is responsible for determining what is Halal and as far as he is concerned 'dirty, undercooked food w/ hair and swine' is considered Halal food in his book." Dkt. No. 102 at ¶36; Dkt. No. 103 at ¶21. Assuming that the defendant told the plaintiff that he (the defendant) determined what food was Halal and that he considered food with "hair and swine" to be Halal, this statement could not reasonably mean that the defendant determined the jail's Halal menu, and that he included "dirty, undercooked food w/ hair and swine" in his menu for the jail's Halal food. See Omnicare, Inc. v. UnitedHealth Group, Inc., 629 F.3d 697, 704 (7th Cir. 2011) (district court not required to draw every requested inference at summary judgment but, rather, it must only draw reasonable ones that are support by

13

the record) (citing Omosegbon v. Well, 335 F.3d 668, 677 (7th Cir. 2003)). If the defendant said what the plaintiff alleges he did, he would have been wrong. The undisputed facts show that the defendant did not have the authority to override and/or refuse to comply with any decision made by jail administration, including the dietician, in connection with dietary requests. The defendant supervised the incarcerated persons who prepared the meals in the kitchen. Because the defendant did not determine the jail's Halal menu, he cannot be held liable for any non-Halal food items the plaintiff received.

The defendant had no authority to approve or deny an inmate's dietary request and did not have authority over, or involvement in, setting the menus for the various diets the jail serves. A reasonable factfinder could not conclude that the defendant violated the plaintiff's right to practice his religion.

Regarding the plaintiff's claims under the Establishment Clause and the Equal Protection Clause, the plaintiff has not submitted evidence that the defendant singled out a particular religion for special treatment or that adherents to other religions received acceptable religious diets while he did not. He cannot show that because, as discussed above, the defendant did not have the authority to approve dietary requests. The plaintiff cannot prove a claim under the Establishment Clause or the Equal Protection Clause. See Goodvine v. Swiekatowski, 594 F. Supp. 2d 1049, 1058-59 (W.D. Wis. 2009) (with respect to the plaintiff's allegations that the defendants discriminated against him because of his religious beliefs, the question under the Establishment Clause and the Equal Protection Clause is whether the defendants "singl[ed] out particular religions for special treatment without a secular reason for doing so."); see also Kauman v. McCaughtry, 419 F.3d 678, 683 (7th Cir. 2015); Schlemm v. Wall, 784 F.3d 362, 364-65 (7th Cir. 2015). The court will grant

the defendant's motion for summary judgment as to the plaintiff's claims under the Free Exercise Clause, Establishment Clause and Equal Protection Clause.

2. *Conditions of Confinement Claim*

Because the plaintiff was a pretrial detainee, court must assess his conditions-of-confinement claim under the Fourteenth Amendment. Mulvania v. Sheriff of Rock Island Cty., 850 F.3d 849, 856 (7th Cir. 2017). A pretrial detainee's constitutional rights may be violated when jail officials act unreasonably to objectively serious living conditions that deprive the detainee of basic human needs. See Smith v. Dart, 803 F.3d 304, 309-10 (7th Cir. 2015) "[T]he Fourteenth Amendment's Due Process Clause prohibits holding pretrial detainees in conditions that 'amount to punishment.'" Id. (quoting Bell v. Wolfish, 441 U.S. 520, 535 (1979)). "A pretrial condition can amount to punishment in two ways: first, if it is 'imposed for the purpose of punishment,' or second, if the condition 'is not reasonably related to a legitimate goal—if it is arbitrary or purposeless—a court permissibly may infer that the purpose of the government action is punishment.'" Id. (quoting Bell, 441 U.S. at 538–39). To prevail on his claim that the conditions of pretrial confinement violate the Constitution, a detainee must prove that (1) the conditions in question are or were objectively serious; (2) the defendant acted purposefully, knowingly, or recklessly with respect to the consequences of his actions; and (3) the defendant's actions were objectively unreasonable—that is, "not rationally related to a legitimate governmental objective or . . . excessive in relation to that purpose." Kingsley v. Hendrickson, 576 U.S. 389, 398 (2015).

The plaintiff claims that he received food trays that were nutritionally inadequate and often inedible and that, as a result, he lost weight, became malnourished and suffered mental harm. This claim is linked to the plaintiff's

religious claims; he says he didn't eat some of his food because it was not Halal-safe. As the court has explained, the defendant is not responsible for the plaintiff's receipt of non-Halal food. The court will focus on the plaintiff's other complaints about his food. He asserts that he received food that was not "nutritionally sound" and that was dirty, undercooked or contaminated.

Prisons have an obligation to "provide nutritionally adequate food." Antonelli v. Sheahan, 81 F.3d 1422, 1432 (7th Cir. 1996) (allegations of rancid food and a nutritionally deficient diet state a claim for violation of the Fourteenth or Eighth Amendment) (quoting French v. Owens, 77 F.2d 1250, 1255 (7th Cir. 1985)). The plaintiff, however, has not offered any evidence to support his contention that the food provided was nutritionally deficient. It is undisputed that the plaintiff was offered food every day at the designated mealtimes. The plaintiff asserts that he lost weight while he was at the jail; he says that when he entered the jail, he weighed 210 pounds and when he left the jail six months later, he weighed 169 pounds. According to the Wisconsin Department of Corrections website, the plaintiff's height is 5'9".[8] Based on the plaintiff's height, if he weighed 169 pounds when he left the jail, his Body Mass Index would have been 25.0, which is just in the "overweight" category.[9] The plaintiff has not submitted evidence to support his claim that he weighed 169 pounds when he left the jail or that that weight posed a risk to his health. Cf. Jacobs v. Frank, 225 F. App'x 397, 399 (7th Cir. 2007) (inmate's weight was at the top of the 150 to 190-pound range appropriate for a man of his height;

---

[8] https://appsdoc.wi.gov/lop/details/detail (last visited June 30, 2022).

[9] https://www.nhlbi.nih.gov/health/educational/lose_wt/BMI/bmicalc.htm (last visited June 30, 2022).

DOC not obligated to feed inmate enough to maintain pre-incarceration weight of 250 pounds).

The plaintiff contends that comments the defendant made to him show that the defendant violated the plaintiff's constitutional rights. For example, the plaintiff states that he started to receive food shortages after February 21, 2018, and that the defendant said he hated the plaintiff's "Islamic ass." Dkt. No. 103 at ¶13. In addition, the plaintiff states that the defendant made comments about the plaintiff's weight loss and "emaciated state." Id. at ¶15. Assuming the defendant made these comments to the plaintiff, they do not establish that he violated the plaintiff's rights because, as explained in the preceding section, the defendant lacked the authority to determine the plaintiff's diet. A reasonable factfinder could not conclude that the defendant's alleged comments to the plaintiff about his "emaciated state" and his comparison to a "starving white Jew in a holocaust camp" were serious, given the plaintiff's own statement about how much he weighed when he left the jail. See Omnicare, Inc., 629 F.3d at 704.

Even if the plaintiff had established that the diet he received subjected him to an objectively serious deprivation, he has not shown that the defendant's actions were objectively unreasonable. Jail policy provides that incarcerated persons should direct their food complaints to jail staff, who will forward the complaints to the kitchen as needed. The record shows that most of the plaintiff's complaints were directed to jail staff, per jail policy. The record includes several complaints that were addressed to jail staff to which the defendant provided a response. The notes on these grievances, as well as several that the plaintiff submitted directly to the kitchen, show that the

17

defendant was responsive and tried to be helpful regarding the plaintiff's issues with his food.

Specifically, when the plaintiff filed a complaint stating that kitchen kept getting his Halal meal wrong because he wanted cake or cookies, and because his diet was supposed to be rich in food meat items, the defendant responded that the meat and gravy might contain a pork seasoning or byproduct. Dkt. No. 97 at ¶¶23-24. In response to the plaintiff's complaint that applesauce was not a Halal-approved food item, the defendant responded that unsweetened applesauce was an approved Halal item. Dkt. No. 97 at ¶¶27-28. In response to the plaintiff's complaint that his Halal meal should not contain potatoes and beans every day, should be more diverse and should include two peanut butter and jelly sandwiches with each meal, the defendant responded that Halal meals were on a rotating menu cycle. Dkt. No. 97 at ¶¶30-31. In response to the plaintiff's complaint that an officer did not do the morally right thing and go to the kitchen to get jelly for his sandwich, the defendant responded that a request was honored for a peanut butter sandwich and that the kitchen would do its best to honor any request. Dkt. No. 97 at ¶¶34-35. In response to the plaintiff's complaint that there was hair in his food, that Officer Kelly took care of the issue, that the plaintiff constantly was getting hair in his food and that the kitchen gave him non-Halal food items, the defendant responded that kitchen staff followed sanitation procedures and that the plaintiff received the proper Halal diet. Dkt. No. 97 at ¶¶50-51. When the plaintiff complained that his dinner bag contained salami/baloney sandwiches, the defendant responded that a standard bag was sent unless an officer requested a Halal bag. Dkt. No. 103-1 at 1. In response to the plaintiff's request to the kitchen supervisor for

18

Case 2:20-cv-00493-PP   Filed 08/26/22   Page 18 of 20   Document 108

information on what the jail nutritionist considers Halal food items, the defendant provided the plaintiff a Halal menu to review. Dkt. No. 103-1 at 21.

The plaintiff has not shown that the defendant violated his rights under the Fourteenth Amendment. The court will grant the defendant's motion for summary judgment.

### III. Additional Matter

In his response to the defendant's motion for summary judgment, the plaintiff contends that, in addition to allegedly violating his rights under the federal Constitution, the defendant violated the plaintiff's rights under Wisconsin state laws regarding negligence and intentional infliction of emotional distress. Dkt. No. 101 at 1. While the court's screening order determined that the plaintiff did not state any claim under the Wisconsin Constitution, dkt. no. 16 at 18, it did not address whether the plaintiff stated claims for negligence and intentional infliction of emotional distress. Because the court has concluded that the plaintiff has no federal claim, the court will relinquish supplemental jurisdiction over any state law claims the plaintiff may have stated in the second amended complaint. See 28 U.S.C. §1367(c)(3); Lavite v. Dunstan, 932 F.3d 1020, 1034-35 (7th Cir. 2019).

### IV. Conclusion

The court **GRANTS** the defendant's amended motion for summary judgment. Dkt. No. 95.

The court **DISMISSES** this case. The clerk will enter judgment accordingly.

This order and the judgment to follow are final. A dissatisfied party may appeal this court's decision to the Court of Appeals for the Seventh Circuit by filing in this court a notice of appeal within 30 days of the entry of judgment.

<u>See</u> Federal Rule of Appellate Procedure 3, 4. This court may extend this deadline if a party timely requests an extension and shows good cause or excusable neglect for not being able to meet the 30-day deadline. <u>See</u> Federal Rule of Appellate Procedure 4(a)(5)(A).

Under limited circumstances, a party may ask this court to alter or amend its judgment under Federal Rule of Civil Procedure 59(e) or ask for relief from judgment under Federal Rule of Civil Procedure 60(b). Any motion under Federal Rule of Civil Procedure 59(e) must be filed within 28 days of the entry of judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2). Any motion under Federal Rule of Civil Procedure 60(b) must be filed within a reasonable time, generally no more than one year after the entry of the judgment. The court cannot extend this deadline. <u>See</u> Federal Rule of Civil Procedure 6(b)(2).

The court expects parties to closely review all applicable rules and determine, what, if any, further action is appropriate in a case.

Dated in Milwaukee, Wisconsin this 26th day of August, 2022.

**BY THE COURT:**

**HON. PAMELA PEPPER**
**Chief United States District Judge**